Just a second. Okay. Mr. Lane. May it please the Court. My name is Neil Lane and together with Matt Peppin we represent certain underwriters at Lloyd's of London in connection with this appeal. In this case, in June of 2008, a propitious time for the banking industry as it turns out, underwriters agreed to insure the directors of a troubled bank for all the wrongful acts of the bank going forward. But recognizing the risks of insuring a troubled bank, they included an exclusion and what they made clear in clear and unambiguous language is that they would not be responsible for insuring against wrongful acts either that occurred prior to the inception date or that were interrelated with wrongful acts that occurred prior to the inception date. The language is clear and unambiguous. Underwriters are not responsible for wrongful acts during the policy that have a common nexus with any fact or series of fact. The language the Court has made clear. Have to be wrongful on both sides, right? That is correct. Most of the OREO property was not the result of the lending division's wild misconduct. Oh, no. Actually, if you look, the OREO grew by 20-fold as a result of the wrongful CDLD conduct. Well, was that just because the lending division loans were so much larger in amount than the other loans? For example, I have three-page parts of the record that says of the more than 600 OREO properties upon which the allegedly wrongful or inadvisable OREO expenditures are made, 97 originated from the lending division's unsound loans. Is that inaccurate? I think it is not that it is inaccurate. It is that every single one of the OREO expenditures that are alleged as OREO wrongful acts came out of the CDLD program that were wrongful acts. So there were 503 OREO properties that no expenditures were made on? I do not know if that is accurate. If you look at document 153-1, paragraphs 82-85, it makes clear that it is undisputed that the OREO wrongful act expenditures were all made pursuant to the loss mitigation strategy that they undertook as a result of the wrongful lending policy. So these wrongful acts were connected to the wrongful acts. But they applied them to properties that were not in the OREO portfolio because of the lending division misconduct. It is undisputed that the overwhelming majority, 86 percent, of the expenditures came out of the lending program. So you have the loss mitigation strategy, but the loss mitigation strategy was not limited to those 97 properties. So they made an overall strategy. So the strategy might have had an effect, but if you did a side-by-side of the properties, only 97 of them, only about one-fifth of them actually came out of the OREO portfolio, correct? We are only looking at the wrongful acts that they allege in this claim. Those wrongful OREO acts did arise out of the CDLD lending practices. And so we didn't... All of them. I think in paragraphs 82 through 85, they concede that they are all the product of this loss mitigation strategy that occurred as a result of the CDLD wrongful acts. The bank officers were very explicit in their testimony. And then the FDIC actually stipulated that it was undisputed that this program, they discovered the problems with the CDLD lending program prior to inception. And they actually started this strategy with the OREO properties where they spent money to try and dig out of the hole in 2007. They didn't apply that strategy to any other properties except the lending division properties? The lending division properties were the overwhelming bulk of all properties on which OREO expenditures were made. Well, let me... There were 14 percent that were not OREO properties or that were not subject to the CDLD wrongful lending act. That may be the case. But the overwhelming... But the identity between the actual wrongful acts alleged, that is, you wrongfully made these OREO expenditures in the policy period, are all related to the CDLD lending practices in the prior policy period. I don't understand why they would make the claim only against the ones that you might have a defense to, is my point. I don't understand. If they had property, that being the FDIC eventually, if there was property that there had been imprudent, I will call it, OREO expenditures on that weren't connected with the lending division. I don't understand why they would carve out those properties in the claim, which are the properties that absolutely you have no argument on. They can't be interrelated wrongful acts if they are completely divorced from the lending division screw-ups. Well, it's clear that they divided their wrongful acts into two groups in order to hit the progressive policy period and the underwriters policy period. And so that distinction is artificial. Certainly if you look at, for instance, the Zucker case, which looked at whether the prior acts, the second set of acts arose out of the first set of acts. And in this circumstance, the OREO, there's a close identity with the OREO expenditures that are alleged in the second... Maybe I misinterpreted paragraph 85 of 153.1 and paragraph 29 of 155.1. I will check that. But for present purposes, let me ask you this. Purely hypothetical, and please don't fight the hypothetical. Purely hypothetical, if all of the OREO property expenditures were for loans that were not lending division misconduct loans, you wouldn't have a defense under the Interrelated Wrongful Conduct Clause. If the OREO expenditures did not arise out of the consumer lending division or the consumer lending... Weren't on, you keep saying arise. Policy adoption is not enough for me. The fact that they've adopted the policy because of the lending division, that doesn't cut it. Speaking only for myself. But if they had, let's put it this way, $10 million is what we're talking about. If they had $10.1 million worth of imprudent expenditures on non-lending division OREO properties, you would not have a defense under the Interrelated Wrongful Conduct Clause, right? If they were completely unrelated, yes, Your Honor. I would say if they came from, for instance, the commercial bank lending division or something, or they arose from a different set of circumstances that were not wrongful in some way. Or if the properties had entered the portfolio before the lending division went wild. That would, yes. Or after. Yes. And so all we're comparing are the alleged wrongful acts on both sides. So we didn't, we're not, it's not the insurer's job to go in and do an audit, but we look at the wrongful acts and we say, are these, do these have the nexus sufficient to say that they're interrelated wrongful acts? The nexus is the properties originated because of the lending division misconduct. Yes, because the lending division misconduct, there was a 20-fold increase in the amount of warrior property because these loans went bad, they took them over, and they took them over at an improved value. And then the reality was, if they sold them at an unimproved, right, they would have a huge hole. And they could, and there was a glut. And so these practices, these wrongful practices resulted in this glut of property that they then started spending money in in order to patch the hole that was going to become very apparent in their balance sheet if they tried to sell the properties. And that, the FDIC said, you were wrong to make those loans and you were wrong to make those expenditures to try and improve the loans, to try and improve your position. And those are related according to the undisputed facts. Let me ask you this question. Both sides agree in this case that New York law controls here. And when you look at the Second Circuit case of Dormitory Authority of New York versus Continental Casualty Company, it looks to me like the analysis the Second Circuit followed in that case really mirrors what Judge Batten did in this case. How do you distinguish what the Second Circuit said in that case versus what Judge Batten did in this case? Okay, so what I would say, in the dormitory association case, that was an interesting situation. There were two separate sets of claims, or two claims. One was that the architecture firm had delayed completion, and thus it resulted in a loss of rental income. The second one, the second piece, was that the design was flawed and that it caused ice and snow to The delay in completion is what caused the ice and snow to fall on the sidewalk. To me, they appear so distinct in this circumstance that I don't see how you would say that they're interrelated wrongful acts. The problem that I see, what I see that the judge did here, the trial court did here, that was wrong, is rather than following the language in the policy, he actually came up with kind of two different tests. One was, were the wrongful acts, in his words, inexorably entwined? Okay? Now, I would say the language of the exclusion is very clear. The language of inexorably entwined is not clear at all. But in any event, that was the test that he did. And the other test was, are they not unduly unrelated? Are they not unduly interrelated? Again, not the test that the plain language of the exclusion applies. And so for that reason, and I see I'm out of time, Your Honor. I took you out of time on that because I tried to work through it myself and couldn't. We just got two cases today. And this one is going to take some digging. So I'm going to And then we will add eight minutes to add eight minutes to the opposing counsel's side as well. Okay. Well, I would say, I would say this, that what happened was that the language of the exclusion is very clear. Is there this nexus? Okay? And if you apply it, I believe that you will find that there is a nexus. Okay? The loss mitigation strategy that was It actually was undertaken as a result of the CDLD loan program that dug a big hole in the balance sheet, unbeknownst to certain of the officers at the time. And that the Orio wrongful acts comprise expenditures that resulted from this CDLD program. They are very interrelated. The bank officers were very clear about that. And that's why it's undisputed when you look at the, you look at the stipulations. Well, I have a quick question. Yes, Your Honor. The, were the CDLD expenditures made on the Orio properties, do you, were they wrongful acts prior to the CAMEL-5 rating? So would you, had the CAMEL-5 rating not come in, would they still have been considered wrongful acts? Well, that is one of the suggestions that the FDIC makes. And I would just say this, we don't have to, it's not the underwriter's job to determine what was wrongful. It's, it's to determine if what was alleged to be wrongful was interrelated. And so if they, if they weren't wrongful, they wouldn't, they're only suing on the things that they say were wrongful, presumably. And so if we go back at what point in time, which Orio expenditures, if it turned out that only 14% of the properties needed Orio expenditures, would they have sued these directors? We don't know. That's an imponderable, actually, because it would have maybe been manageable and the bank might have survived and it might be here today. But the question is, are the wrongful acts that were actually alleged, these Orio expenditures, are they interrelated with the previous wrongful acts of the lending programs that led to the overhang? Does that, is that helpful at all? Well, yes and no, but I understand your argument, but it seems to me that the bank did not implement the plan until December of 2007. The lending had ended a few months before that, in autumn of 2007. And then the, I believe there was a concession that the expenditures made to rehabilitate the properties did not become wrongful acts until the Camel 5 rating came out six months after that. So to me, it would limit the universe necessarily. And I think it does, it does play into the Well, I would say this. Of course, the policy incepted June 9, 2008, which was seven months after the policy, the loss mitigation strategy began. Obviously, you know, the issues became much more pronounced after September of 2008, as we, as the court is well aware. Are they wrongful beforehand? Well, the FDIC didn't sue them saying that they were wrongful. Could they have? Would they have? Is this, are the allegations in this case tailored towards coverage rather than tailored towards conduct by the bank officers? Of course, they're going to say now that it was not wrongful then, but we've seen other cases where the FDIC is quite aggressive in terms of saying that acts are wrongful for various reasons. The Camel 5 rating, from the perspective of the officers, they said that was, they were not bound by it. Okay. But the wrongful acts that are alleged by the FDIC, they say that at the time the OREO expenditures were made, they were wrongful acts. If they hadn't been wrongful acts, they wouldn't have, they wouldn't have brought the claims. So it's, so they're not presumably suing based on acts that weren't wrongful. They're suing on wrongful acts and the question is, are they interrelated? I would say that the reason the court adopted this kind of different language, this different test, which was not a test that the circuit has recognized, was because it said that the language as written would result in illusory coverage. Now, the court didn't go into it in sufficient detail to really establish that. The court, it seems to have assumed or to presume that it would have been illusory, something that the broker for the bank, the bank itself didn't believe at the time that they obtained the policy, obviously. It's easy to see that a whole host of wrongful acts, not interrelated with the CDLT wrongful acts, as I think your Honor pointed out, would have not, would have been covered under the policy. And I'll give you some examples. Obviously, in Zucker you had situations where misrepresentations were made about lending practices. The lending practices were faulty. Those resulted in a transfer of $45 million to a subsidiary and that transfer to the subsidiary, to have been arisen out of the prior act. So under this policy, there are two prongs. And the first one is a prior act prong, which also has the arising from language. And I actually believe that this judge, had he had Zucker in hand when he made his decision, would have ruled differently. Of course, we would have briefed it, the Zucker case, would have ruled differently and would have ruled that the later ORIA wrongful acts arose out of the CDLT lending practices. Because they were all a continuous set of factors that in a natural sequence caused. But there are all sorts of other, 2008 is a, provided a, in its ensuing years, provided a wealth of different kinds of cases against bank officers and directors, alleging all sorts of improper acts, which would have nothing to do with the commercial, the community development division. Are you saying that the December 2007 plan was itself wrongful? Are they saying that, I guess? I don't believe they say that. They say the expenditures are wrongful. All right. And they say the lending practices are wrongful. And what the testimony from the bank officers are, and the timing would suggest that this is, that they're telling the truth is, that the expenditures were made as a result of the CDLT lending practices that they uncovered, and that it caused this enormous ballooning. I didn't think they said we adopted the plan because of the CDL. They, the timing of the, when they adopted what they called the loss mitigation strategy, was shortly after they uncovered the problems with the loans. And the loans started to fail. But you tied yourself to what they claim is wrongful. The FDIC doesn't claim as wrongful the adoption of the plan. I think it's fair to say if the plan had never been executed, if they'd never made any OREO expenditures that are alleged wrongful by the FDIC, they wouldn't have, they wouldn't have sued just merely on the adoption of a strategy which maybe a week later was abandoned. Or that they said, well, actually we need to come clean and take a hit. Or that worked. Exactly. Well, I would say that the problem is, I don't, you know, if it wasn't 2008, maybe, you know, who knows whether it would have worked. But the problem is they had vastly overstated assets. And they attempted to support that vast overstatement with their OREO practices. Here I would say that the, that the dormitory case is different because those are such distinct wrongful acts. One is a loss of rental income due to late completion. One is snow falling off of a roof due to design. That the analysis here shouldn't hew more closely to the actual language of the exclusion. And that, and with, and if it does, then in the future, and there will be other bank problems, they'll be able to, directors will be able to fire. Okay, Mr. Lane, we'll give you five minutes and we're going to add eight to Mr. Brooks. So he will have 23 minutes. If he needs it. Good morning, Your Honors, and may it please the Court. I am Joseph Brooks from the FDIC's Appellate Litigation Unit. Could you first comment on the question I asked about how many of those 600 OREO properties that you claim the expenditure of money after December 2007 was wrongful or imprudent? How many of those were CDL properties and how many weren't? Your Honor, my best information is that the number 86% is probably correct. We do not make an argument on this appeal based on whether or not the expenditures were made on properties that either were or were not part of the CDLD wrongful acts. Our arguments assume that they were. But Judge Abrams hit the key point, and the key point is this. Listening to counsel for the other side to argue, one would get the impression that the FDIC objected to all expenditures on OREO post adoption of the OREO expenditure plan. We absolutely do not. And as counsel indicated, there is a stipulation in the record that they made that we rely on that none of the expenditures under the OREO plan prior to the inception of this policy were wrongful acts. As a matter of fact, none of the expenditures, the OREO expenditures under the OREO expenditure plan during the first three to five months of the policy were wrongful acts. As Judge Abrams accurately pointed out, our position is that the expenditure of monies to rehab OREO properties over a long-term basis only became wrongful on the day that the CAMELS-5 rating came down. Which was September of 2008. September 2008. And all we are seeking here is not the $84 million or the $90 million that was spent on the OREO properties. We are only seeking to recover the $12 million, and of course the policy limit is $10 million, that were expended at a point in time when the directors and officers knew that a long-term investment strategy was that is the OREO wrongful act. And more than $10 million or more of those expenditures were on CDL-linked OREO properties. We assume that they were, Your Honor. Yes, we don't dispute that. Well, I mean, it's in your favor if it was. So of course you'd be glad to assume things in your favor. I'm glad to assume things, Your Honor. I don't want to make any misrepresentations. Our position is this. The causal linkage, if you were, that must exist between the wrongful acts in the lending division, the so-called CDLD wrongful acts, and the wrongful acts that occurred post-CAMELS-5, there is no linkage for two reasons. One is, under the Eureka case, the Ninth Circuit case cited in our brief and ignored in the reply brief, the Ninth Circuit had a similar situation. There was a claim brought that there were over 200 wrongful loans that led to an incredible amount of losses. And those loans were made pursuant to a policy, an aggressive lending policy that had been adopted by the bank. And the allegation was made that that policy caused the losses under the loans. And the Ninth Circuit said, no, that's not the case. The subsequent to the policy, independent business determinations to make those loans were the cause. Similarly here, the CDLD wrongful acts that created the pool of OREO didn't cause our damages. Indeed, we know that because for a long period of time, after the CDLD wrongful acts ended, after the OREO rehab policy was adopted, and while millions of dollars in expenditures were being made, there were no wrongful acts. It was only after the CAMELS-5 rating, accompanied by a warning that the failure of the bank was imminent, came down. And then the directors and officers made an independent business decision to continue spending money on a long-term investment. It was only then that we had OREO wrongful acts. But that doesn't mean there's not a common nexus between the only then wrongful acts and pre-policy effective date wrongful acts. Well, I believe it means precisely that, Your Honor, because the common nexus, according to our opponents, is a, quote, causal connection. And our position is that the causal connection was cut off. And that analysis, by the way, is entirely consistent with Judge Dubina's point, which is if you look at what the trial judge did here, he didn't disregard the policy language. He didn't go off and find a new standard. He performed precisely the kind of analysis that the Second Circuit performed in Dormitory Authority, that the Southern District of New York performed in Glascoff, and indeed, that every single court that addressed an interrelated acts or a related acts provision that's cited and discussed in underwriters' brief performed. They lay the claims or the wrongful acts side by side. They look at what's common and what's uncommon. And our position is that any one factor makes it related or interrelated. Our position is that consistently, those courts have found where there are three factors that are different, where the wrongdoers are different, where the wrongful conduct is different, and where the time period in which either the wrongful conduct or its manifestation occurs is different. When all three of those are to trigger an insurance policy. Let me ask you this. If you were writing a one-sentence holding about common nexus, finish this sentence for me. We hold that common nexus in this context means colon. Well, if I were writing the opinion in this case, Your Honor, make sure I have your question. Fantasize for a moment, please. Yeah. Well, we would hold a common nexus means a direct causal connection in which you have the same or similar wrongdoing occurring during the same time period and involving the same wrongful actors. Now, that sounds less interrelated to me than identical. Well, Your Honor. Same wrongful conduct, same time period, same actors. Everything's identical. Well, again, Your Honor, we're under, no, no, no. I'm not saying the same conduct. It's the same type of wrongful conduct. For example, what the cases have done, a lot of these cases are securities law cases, and you have the same type of misrepresentations that are made to different people. It's not the same identical conduct. It's the same type of conduct as opposed to what we have here. Your Honor, on the one hand, we have a group of directors and officers in a lending division that are engaged in unsound lending practices. And then two years later, we have a different group of officers and directors who are given the responsibility to dispose of property and spend the bank's money to make investments. We have, on the one hand, unsound lending practices, on the other hand, corporate waste. It's entirely different conduct. And as the district court, I think, aptly pointed out to properly analyze this case, and this is consistent with the Eureka decision as well, it makes no difference when the OREO defendants decide to spend or not spend money in order to deal with a overextended OREO problem. It makes no difference how that OREO got there, whether due to wrongful acts, it got there due to a bad economy. They have to make a decision. Is it prudent? Is it reasonable to continue investing long-term in this property, given that we now know from government authorities that the failure of this bank is imminent? And from the standpoint under the Lipton case in New York, the critical thing here is, would the policyholder, would the directors here believe on the day that they purchased this In other words, would they believe that if, after that policy went into effect, they had made imprudent, negligent, and grossly negligent decisions to expend the bank's money, would they believe that they would be covered in some instances, but perhaps not in others, depending upon what they spent the bank's money on? Certainly not. They would certainly expect that directors and officers' coverage would cover them for this independent business decision, as the Eureka Court held. So to make these expenditures under the most imprudent of circumstances. Let me ask you this. What does the record show about the negotiation over this part of the contract? And you can put scare quotes around negotiation if you want to. Just tell me what the evidence shows about what your broker asked for and didn't get. Your Honor, we give you chapter and verse in the brief as to this part of the policy. Yes. As far as I understand, there's no dispute. There was no negotiation, zero negotiation. The entire language is industry standard language. And you don't have to take my word for that because it keeps popping up in all these different cases. The only alleged negotiation, and I do say alleged very advisedly, the only alleged negotiation goes to the other exclusion that's at issue in this case. Nobody says there was any negotiation of this provision. All right. What was the negotiation as to the other provision? The other provision, which is the insured versus insured provision. Right. Has the critical language, which is whether or not a claim is brought by or on behalf of an insured. Right. Zero negotiation. It then has an exception that deals with instances where receivers may or may not bring claims. As to that, the record, and again, the chapter and verse cites from the brief shows that the bank, actually not the bank, but the bank's parent, the bank's parent who could have a receiver, unlike the bank, that is not subject to the FDIC restraints, the bank's parent sought a specific narrow exception. An underwriter's representative whose testimony is on the record said, no, you can't have that. But here's some other standard form of language you could have. So there was negotiation over the exception. But, Your Honor, you don't get to the exception here because the exclusion itself says that excluded are claims that are brought by or behalf of, by or on behalf of an assured. Right. And then before this, it says, and except where such claim, except where such claim, and then it gets to the exceptions. What is such claim? Such claim, of course, is a claim brought by or on behalf of the assured. And under this Court's decision in St. Paul Mercury Insurance and numerous other decisions, whether or not the FDIC, unique among receivers, brings a claim by or on behalf of a failed bank is at best ambiguous because under FIREA, the FDIC isn't charged with bringing claims on behalf of a no longer existent bank. It brings claims on behalf of the Federal Deposit Insurance Fund, the creditors, and the shareholders. And so if you choose that language, by or on behalf of the assured, it's at best ambiguous. In the FDIC's view, of course, it's pretty clear that they didn't bring a claim. That was not negotiated. That's standard form policy language. It appears in, you know, numerous different insurance companies' policies. And so there was no negotiation. There was simply standard form language. It is a policy exclusion. And even assuming for the sake of argument that a New York court would apply some version of contraproferentum here, it certainly wouldn't be a broad version. It certainly wouldn't apply to an exclusion because as the New York courts have said, the rule that an exclusion must be clear and unmistakable is a heightened application of contraproferentum. Contraproferentum applies in a big and large way to exclusions. So they certainly wouldn't apply it to an exclusion, to language within an exclusion that wasn't negotiated by the so-called sophisticated and assured, and which instead had standard policy language. Your Honor, I would want to make one other quick point. I don't know that I'll need all the time, the stuff that I'm happy to continue answering questions, but a quick point that I would want to make is the Zucker case. The Zucker case has nothing to do with this case, absolutely nothing, and here's why. As Mr. Lane pointed out, the Zucker case dealt with the issue of whether or not a claim during the policy period arises from a pre-policy period wrongful act. And as Mr. Lane pointed out, the exclusion here, the retroactive exclusion here has two prongs. The first prong deals with what I just said. Does a policy period claim arise out of a pre-policy wrongful act? That prong is not a part of this case. And the reason why it's not a part of this case is because not only was that argument waived, because nowhere in the opening brief and nowhere in the reply brief do underwriters ever contest the trial court judge's ruling that the first prong wasn't satisfied here. But more importantly, if you go to the brief, the opening brief in this case, I believe it's at page 10 through 11, excuse me, it's at page 13, and I want to quote from the brief. This is underwriter's brief speaking to this court. Quote, the district court mistakenly then underwriters asserted that the first prong of the retroactive exclusion, which applies to wrongful acts that occurred prior to underwriter's policy period, applied to the oral wrongful acts, unquote. In other words, not only did they not raise the argument in either their opening brief or their reply brief, but they expressly repudiated having made the argument in their opening brief. So Zucker is entirely inapplicable to this case. And unless the court has further questions, I don't have anything further at this time. We don't. Thank you. I would simply ask the court then to affirm the district court in all respects. Thank you. Mr. Lane, five minutes. Yes, Your Honor, a couple of notes. On the issue of Zucker, obviously I view it differently than counsel for FDIC because I believe that Zucker really leads the way to a reversal in this case, and here's why. Yes, there was a prior act exclusion involved in Zucker. It is identical to the first prong of this interrelated wrongful acts provision, okay? And the judge said this didn't arise out of the prior acts. Had he had Zucker in hand, I believe he might have decided differently. But having said that, if the first prong would have applied, the second prong applies a fortiori because there has to be a common nexus with the prior acts if the subsequent acts arise out of the prior wrongful acts. So the nexus is satisfied irrespective of whether you applied the first prong, whether you even noticed the first prong. What I'm saying is in Zucker, the court looked and what happened in Zucker, there was no allegation that the same people making the improper loans were the same people who decided to transfer the $45 million. That restrictive reading that the FDIC wants, when you ask them what does the nexus mean, I mean, obviously they would like to have, the parties have negotiated a much more narrow and a different language for this exclusion. That isn't what happened. It was common nexus. And these are factually, legally, causally related what happened. The other thing is, if you'll notice, the FDIC contends that not only should it be the same people, the same acts, and basically the identical acts. So read out that it's interrelated subsequent acts. But they say it has to be during the same time period. Well, how can that be possible? If the interrelated wrongful acts exclusion applies during our policy period and it says it excludes wrongful acts that are interrelated with a prior time period. So the time limitation, obviously, is not readable. So that the language that he dictated to the court is not the language that's in the policy. It's not the language that's dictated by law. It's not the language that should apply. Now I want to talk a little bit about the sophisticated insured exception because I think that's what the court was getting at. It is not that you look at each particular provision and determine whether it was specifically negotiated. Here's the deal. If I enter into a transaction with IBM, and maybe I'm showing my age that I think of IBM as the huge exemplar of a corporation, and I propose seven terms and they decide to accept six of them and change only one, that doesn't mean they didn't have bargaining power to change those six or to negotiate. That means they accept it, okay? That means they join with me in that agreement and we both sign our names. And the essence of the sophisticated insured exception is not whether you negotiated a provision. It's whether you had the bargaining power to have a seat at the table and to give your opinion. And you may give your opinion. You may say, as anyone who's engaged in a large negotiation and large transactions or had to litigate them after the fact, some things are that. Let's please change that. And you say, absolutely not. He's negotiated, right? Well, he may have taken that position with Progressive. And that's why he came out. I'm talking about with you. If what? If the insured, the bank comes to you and says, we don't want that. Let's change that language. They're brokered. And you say, absolutely not. Take it or leave it. That's negotiation. Yeah, they have a choice. And the contra-canon doesn't apply there? No, the contra-preferendum does not apply when it's a sophisticated insured. No. It was either a broker, has a broker or has a lawyer. No. Just no. You write the language. You're stuck with the ambiguities. They're construed against you. Now, if they say, let's do this language instead, and you say, what about this? And you apply. We appreciate you coming to see us. Here's your hat. Here's your coat. We're going to stick with our language. Your Honor, if you look at the Cummins case, they don't actually get into whether specific. That's a New York State court case. They don't look at specific provisions. It's the policy and the focus is on the bargaining power. It's not whether each individual provision was negotiated because we know that they may have been just delighted just to get a policy. Well, that may be New York law, and I'll look into it, but it's strange law if it is. I don't know of any jurisdiction in our circuit that it offsets, and certainly I've never seen us say that. And that's kind of like saying a prisoner who's to be executed by a firing squad has to see the warden. The warden comes in to see him. He says, please don't shoot me. The warden says, I have no choice. And then the next day, the warden says, we negotiated his execution. I mean, come on. I would say the more accurate analogy would be a homeowner insurance policy where I'm a consumer and I can't realistically change the form of my homeowner insurance. That would be a different situation as opposed to a situation where I'm a company and I can negotiate insurance. Cummins is your best case on the contra count and doesn't apply if it's a big sophisticated insured. Well, I would also say the Southern District of New York's 2014 case Catlin also acknowledges that where the parties negotiate terms, the sophisticated insured exception to contra preferendum applies. I thought, as a matter of fact, I know this is what Cummins says because I have it in quotes. New York does not apply contra preferendum when the insured is, quote, sophisticated, comma, instrumental in crafting various parts of the agreement, comma, end of quote. I agree. Various parts. It doesn't have to be the specific provision at issue in the litigation. There is no question that there were, and it's in the stipulated facts, that there were that represented that. Yeah, but did Lloyd's accept the draft revisions or did the policy end up being what Lloyd's proffered to start with? It was a bespoke policy that did. It was not a form policy like an acorn policy that you would see where it's taken on a shelf. But the component parts were all drafted by Lloyd's, were they not? Actually, what happens is the broker submits language. Typically, it's the broker's language when dealing with the London market. And then the parties negotiate off the broker's language. The broker represents the insured. But wasn't the language the broker was offering originally drafted by Lloyd's? Didn't they have subparts? Well, the broker may, okay, he pointed out that there are lots of different cases that have similar language and the broker may propose a form because that form may, he knows, may be, or she, may be acceptable to the insurer or to the insured. And it's the subject of negotiation. We're talking about hundreds of years of history, obviously, between the brokers and the insurers. But the broker represents the insured. The broker doesn't represent the insurer. But if the insurer says, here are six different versions of that language, I'm sorry, of that component of the policy, six different versions, pick one. And the broker says, well, we'd like to change the language in number three. And the insurer says, no, just pick one. That's not negotiation. Your Honor, I would disagree. If I tell IBM, I insist on this, and IBM ultimately says, I'm going to agree to that language, they have bargaining power. They've chosen to accept my proposal. And that is the agreement. But your proposal is pick one or hit the door. That's the essence of bargaining power, is that I can leave when I'm negotiating. I can walk out the door and go elsewhere. And who gets to walk out? No, the insurer. For the contra, Canon. I mean, the homeowner can walk out the door. Well, we're the second insurer they negotiated with. I understand that. That doesn't change the fact that it was your language that they agreed to. And they could have gone to a third insurer. And I think in retrospect... And suppose the third insurer says, take it or leave it. We like Lloyd's language, too. We've adopted it from them. Don't tell them. If the third insured... And the fourth and the fifth and the sixth. They've got negotiating power because they can walk out the door and do without insurance. That's some negotiation. That's the essence of bargaining power, though. No, it's the essence of the absence of bargaining power. We got your argument, though. Thank you. And we'll take that case under submission. Thank you.